J-S23001-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.D.A, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 446 EDA 2020 |

Appeal from the Order Entered January 27, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000396-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: K.K.A, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 447 EDA 2020 |

Appeal from the Order Entered January 27, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000397-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: K.A, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 448 EDA 2020 |

Appeal from the Order Entered January 27, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000398-2019


BEFORE:  NICHOLS, J., McCAFFERY, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY NICHOLS, J.:                    **FILED JULY 22, 2020**

A.A. (Father) appeals from the orders involuntarily terminating his parental rights to K.D.A., born in August 2010, K.K.A., born in July 2011, and K.A., born in April 2015 (collectively, Children), under 23 Pa.C.S. § 2511(a)(2) and (b).[1]  We affirm.

We summarize the procedural history of this matter from the record. On February 15, 2017, DHS received a child protective services (CPS) report alleging Mother's and Father's medical neglect of Children's sibling (Sibling).[2] At that time, Mother was living with a relative, and Father was in prison for charges of robbery and related offenses in Philadelphia.[3]  During the investigation into the CPS report, Children came to DHS's attention because their medical checkups were not up to date.

———————————————————————

[1] The trial court also terminated the parental rights of K.B. (Mother).  Mother has not appealed.

[2] The trial court found aggravated circumstances in the case involving Sibling and adjudicated Sibling dependent on May 1, 2017.  The trial court terminated Parents' rights to Sibling on March 27, 2019.  N.T., 1/27/20, at 18.

In addition to Children and Sibling, Mother gave birth to another child in May 2018.  Father was not the biological father of the fifth child, and that child is not subject to this appeal.

[3] Father pled guilty to the Philadelphia charges, and in October 2017, the trial court sentenced him to two-and-one-half to five years' imprisonment and three years' probation in one case and two-and-one-half to five years' imprisonment in another case.  **See** DHS Ex. 1.  We refer to Father's Philadelphia criminal cases as the Philadelphia convictions in this memorandum.

DHS took Sibling into protective custody the same day it received the CPS report. Children remained in Mother's care with Mother's relatives providing supervision. As part of Sibling's case, the trial court ordered referrals for Father to (1) the Achieving Reunification Center (ARC) for parenting, housing, and employment issues, (2) Menergy for anger management issues, and (3) the Clinical Evaluation Unit (CEU) for drug screens, as well as substance abuse and mental health issues.

On April 11, 2017, DHS filed dependency petitions regarding Children.[4] On April 27, 2017, the trial court adjudicated Children dependent. Children remained with Mother on the condition that Mother remain in her relative's home. The trial court maintained its referrals of Father to ARC, Menergy, and CEU, although Father remained incarcerated on the Philadelphia convictions. *See* Orders, 4/11/17 & 10/18/17.

Following a March 7, 2018 meeting to revise the single case plan (SCP), Father's goals were to (1) cooperate with services, (2) make himself available and participate in a community umbrella agency (CUA) case management services, (3) complete and follow recommendations of a CEU evaluation, and (4) submit three court-ordered random drug screens. In April 2018, Father failed to participate in a CUA meeting despite being invited to do so.

---

[4] K.A. was approximately two years old when DHS removed her from Mother's care.

Following Mother's arrest for retail theft and endangering the welfare of children,[5] the trial court committed Children to DHS's custody on May 24, 2018. On November 19, 2018, the trial court permitted Father to have monthly supervised visits with K.D.A. and K.K.A. in prison, or supervised visits at a CUA if he was released from prison. On March 6, 2019, Father was released from prison for the Philadelphia convictions. At a March 7, 2019 hearing, the trial court ordered that Father have supervised visits with Children and undergo a paternity test with respect to K.A.

On May 30, 2019, DHS filed petitions seeking the involuntary termination of Father's rights to Children under 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). At the next permanency review hearing held on June 6, 2019, the trial court granted Father weekly supervised visits and referred Father to CEU for assessments and drug screens. The trial court appointed a child advocate attorney as legal counsel for K.D.A. and K.K.A.[6] Father's drug

---

[5] DHS alleged that Mother and a companion left Children in a running car while they committed the thefts.

[6] The guardian *ad litem* (GAL) from the dependency proceedings continued to represent Children's best interests after DHS filed the petitions to terminate Father's parental rights. The records and dockets do not contain orders appointing legal counsel for K.D.A. and K.K.A. However, based on the notations of the individuals who appeared at continuance hearings, it appears that the trial court appointed legal counsel at some time between June 6, 2019 and September 25, 2019. The trial court later noted that it did not appoint legal counsel for K.A. because K.A. "didn't really understand the process and couldn't make an informed decision." N.T. at 59.

tests in June 2019 and October 2019 were positive for opiates. In November 2019, Father was incarcerated on felony-two retail theft charges in Blair County.[7]

The trial court held a hearing on the petitions to terminate on January 27, 2020. Father's counsel appeared at the hearing, and Father participated by telephone from Blair County prison. Father stipulated to the statement of facts in DHS's petitions to terminate Father's parental rights. The trial court also admitted into evidence a report of Father's convictions.

Thereafter, DHS presented the testimony of Tiana Dixon, a CUA caseworker, regarding the history of the case, Father's incarcerations, and Father's contacts with Children. Ms. Dixon noted that Father's compliance with the SCP was minimal throughout the case, even when Father was not incarcerated. Father submitted two drug screens that were positive for opiates. Ms. Dixon testified that the bond among Father and Children was more like a sibling bond than a parent-child bond. She opined that termination would be in the best interests of Children and that severing their relationship with Father would not result in irreparable harm to Children.

Father testified on his own behalf. Father acknowledged failing the drug tests, but asserted that he was in an accident and was going to therapy.

_____

[7] Counsel for DHS asserted that Father was arrested in November 2019. Father did not dispute that assertion, and in his appellate briefs, he has repeated the November 2019 date when referring to the date of his incarceration for the Blair County charges.

Father indicated that he had a prescription for opiates. He testified that he took the prescription "to the courthouse, and they had it." N.T., 1/27/20, at 32. Later, when he was required to show a copy to "Tiana," apparently referring to the CUA caseworker, he "never got a chance to." *Id.* Father admitted he did not complete a drug treatment program and did not take anger management or domestic violence classes. Father noted he was employed following his release from prison in March 2019 until his arrest in November 2019.

Father testified that during his incarceration on the Blair County charges, he was unable to contact Children by telephone, either through his sister or through the prison counselor. *Id.* at 35. Father indicated that his earliest release date was "maybe in about two months" referring to a court date at which the criminal case against him was "supposed to be getting thrown out." *Id.* at 31. Father anticipated living in an apartment upon his release that his sister would help locate. Father further testified that his sister was holding $15,000, which he obtained from a settlement related to his civil case regarding his accident. *Id.* at 33.

Father testified that he visited Children every Tuesday and that he had a "very good bond with them." *Id.* at 34-35. He stated that he was present with Mother for a dental surgery and helped comfort Children.

K.D.A. and K.K.A.'s legal counsel then presented expert testimony from Roya Paller,[8] a forensic social worker. Ms. Paller testified that K.D.A. and K.K.A. preferred adoption. Ms. Paller noted that when she informed K.D.A. and K.K.A. that adoption would mean that they might not get to see Mother or Father until they were older, they replied, "That's fine." *Id.* at 42.

At the conclusion of the hearing regarding Father, the trial court granted DHS's petitions to terminate Father's parental rights based on Section 2511(a)(2) and (b) and set forth its findings and conclusions of law on the record. *Id.* at 52-56. That same day, the trial court entered the order terminating Father's parental rights to Children.

Father timely appealed and complied with Pa.R.A.P. 1925(a)(2)(i) and (b).[9] The trial court filed opinions referring to and summarizing its statements at the January 27, 2020 hearing.

_____

[8] Although the transcript of the termination hearing spelled Ms. Paller's last name as "Pollard," it appears that the correct spelling is "Paller," *See* Ex. CA1, and we will use the latter spelling throughout this memorandum.

[9] Father filed separate notices of appeals at each trial court docket corresponding to Children. Father's errors complained of in the Rule 1925(b) statements attached to each appeal were identical. In his Rule 1925(b) statements, Father challenged the trial court's ruling under 23 Pa.C.S. § 2511(a)(2) asserting that he "substantially met his [family service plan] goals and thereby remedied his situation" and that DHS did not provide reasonable effort to reunite him with Children. *See, e.g.*, Father's Rule 1925(b) Statement, CP-51-AP-0000396-2019, at ¶ 1. Father also challenged the trial court's ruling under 23 Pa.C.S. § 2511(b) asserting that "DHS failed to provide clear and convincing evidence that involuntary terminat[ion] of his parental rights best served the needs and welfare of [Children]." *See, e.g.*, *id.* at ¶ 2. As discussed further in this memorandum, Father did not object to the

Father presents the following issues for review:

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [Father] pursuant to 23 Pa.[C.S. §] 2511 (a)(2) where [Father] presented evidence that he has remedied his situation by meeting his goals of consistent visitation with his children, Parenting classes, attending medical appointments, maintaining employment and remaining drug free and he has the present capacity to care for [Children] in his home with the help of his sister.

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [Father] pursuant to 23 Pa.[C.S. §] 2511(b) [were] **NOT MET. NEITHER THE CHILD ADVOCATE ATTORNEY NOR THE GUARDIAN AD LITEM EVER MET WITH ANY OF THE THREE CHILDREN, WHO WERE 9 YEARS OLD, 8 YEARS OLD AND 4 YEARS OLD, TO DETERMINE THEIR DESIRED OUTCOMES.** Additionally, evidence was presented that established that [Father] and [Children] had a close bond. DHS undermined [Father] in his relationship with [Children] by not permitting visits with [Father] once he was incarcerated. The best interests of the children should be to incorporate [Father] back into the lives of [Children].

Father's Briefs at 7 (emphasis in original). DHS, the GAL, and legal counsel for K.D.A. and K.K.A. have submitted briefs supporting the order to termination Father's parental rights.

Father first contends that he "substantially completed all his [family service plan] goals and additional requirements of the [trial c]ourt. . . . [He] has done and continues to perform all that was ever asked of him." Father's Brief at 14. Father notes:

---

adequacy of legal counsel's representation of K.D.A. and K.K.A., or the trial court's decision not to appoint legal counsel for K.A. in the trial court. Moreover, Father did not preserve issues related to legal counsel for Children in his Rule 1925(b) statements.

Father's objectives for the life of the case were to have a CEU evaluation and follow recommendations and to take random drug screens. Father was also to take parenting classes, attend a domestic violence program, attend supervised visits and to obtain appropriate housing. Father had several drug screens where he tested positive for opiates, for which [Father] indicated he had a prescription for, due being in an accident. Father completed a parenting class while incarcerated. Prior to his incarceration [Father] provided the social worker with pay stubs to verify his employment.

Father visited consistently with [Children] prior to his incarceration in November of 2019. Father had requested an [individualized education plan] for one child and attended all [Children's] dental and medical appointments prior to his incarceration. Father sent photographs to his children while incarcerated. The social worker for the city[, Ms. Dixon] testified inconsistently regarding the dates of [Father's] period of incarceration.

Additionally, Father testified that he may be released from prison in two months and would be getting an apartment using the settlement funds he got from his accident.

Throughout the case [Father] attended supervised visits at various locations and was always present. Since [Father] was incarcerated in November of 2019, he was never provided with any visitation with his children.

*Id.* at 8-9. In sum, Father asserts that the trial court erred in terminating his parental rights under Section 2511(a)(2). *Id.* at 15.

DHS contends that the trial court's properly terminated Father's parental rights under Section 2511(a)(2).[10] DHS's Brief at 23. DHS asserts that the trial court properly considered Father's incarceration when concluding that Father was absent from Children's lives. *Id.* at 20. DHS further notes that

---

[10] The GAL also filed a brief in support of terminating Father's parental rights to Children. GAL's Brief at 8-9.

the trial court was entitled to rely on Father's repeated incarcerations when concluding that Father was incapable of parenting Children. *Id.*

Additionally, DHS notes that the trial court properly found that there was no guarantee that Father would be released from prison within two months of the hearing. *Id.* DHS emphasizes that Father failed to make meaningful progress with his SCP, failed to address substance abuse issues, did not address his anger management and domestic violence issues, and did not address housing or employment to support Children. *Id.* at 21-22. DHS notes that Father made only minimal progress with parenting and visitation, had limited contact with Children during his incarcerations, and argues that he did not develop a parental relationship with Children. *Id.* In sum, DHS asserts:

> Clearly, Father was not in a position to be a full-time parent for Children. The record reflects that Father's repeated incarceration with no clear release date and failure to meaningfully achieve his SCP objectives left Children without a dedicated parent. As such, termination under § 2511(a)(2) was proper and should be affirmed.

*Id.* at 23.

In reviewing an appeal from an order terminating parental rights, we apply the following standard of review:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. [*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)]. If the factual findings are supported, appellate

- 10 -

courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (citation omitted).

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The

party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b) . . . .

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Initially, we review the trial court's ruling under Section 2511(a)(2) which provides:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the condition and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).

- 12 -

Further, "[t]he grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (citation omitted). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002) (citations and quotation marks omitted).

Instantly, the trial court stated:

[W]ith respect to [Section 2511(a)(2)[11]], I am going to terminate involuntarily [Father's] parental rights. The testimony is the repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his or her physical or mental well-being, and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

The testimony of CUA -- which, again, I've already indicated I found credible -- is that, for at least the first year and a half, almost two years that [Children] were court-involved and then in placement, [Father] was absent because he was incarcerated.

CUA did testify that once [Father] was released in March of 2019, he did make attempts to be actively involved in [Children's] li[ves]. He was visiting consistently. CUA testified he completed a parenting class, even though [Father] indicated he didn't complete a parenting class. But CUA indicated that there's documentation in there, [Father], he did complete a parenting class.

_____

[11] The trial court specifically rejected Sections 2511(a)(5) and (8) as grounds to terminate Father's parental rights. *See* N.T. at 52.

- 13 -

Father indicated that the opiates that were in his system were due to medication, however, there's no documentation to substantiate that claim. And in fact, there were two positive screens for opiates, given about four months apart, which leads me to believe that there wasn't any documentation actually provided to CEU, otherwise, they would not have noted [Father] as positive for opiates. They would have indicated that he actually had a prescription for the opiates.

That being said, DHS -- let me make sure I have the right exhibit -- 1 is [Father's] court summary, and it indicates that [Father] is in and out of prison, and that, in and of itself, especially given the length of time [Children] have been in care, [Father] has been in prison more than he's been out of prison. And as such, he's been unable to parent [Children].

Quite frankly, his incarceration has left [Children] -- and I'll read [Section 2511(a)(2)] -- the repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his or her physical or mental well-being, and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent.

Father has been in prison more than he's been out of prison. And that incapacity or refusal, however you choose to look at it, has caused [Children] to be without the essential parental care, control, or subsistence necessary for each of their physical, mental well-being. Father indicates that he'll be out in two months, but there's no guarantee. He's still in pretrial status, or trial status.

And I am not convinced, given that he was, in fact, released from prison in March of 2019 by his own admission and by CUA's testimony, and within six months, re-incarcerated. So, this Court has no reason to believe that [Father] can or will remedy the causes of his incapacity that has caused [Children] to be without proper parental care and control.

*Id.* at 52-54.

Following our review, we find no abuse of discretion or error of law in the trial court's ruling that DHS established grounds for terminating Father's parental rights under Section 2511(a)(2). The record established that Father

partially complied with the SCP by completing a parenting class while incarcerated for his Philadelphia convictions. *See* N.T. at 22. When out of prison, Father did visit once per week with Children, attended one medical appointment, and obtained employment. *See id.* at 23, 25-26, 34, 35.

Nevertheless, Father's compliance was minimal. *See id.* at 26. Father did not enroll in a drug and alcohol program or address his anger management issues. *See id.* at 21-22, 32. Father also failed two drug screens. *See id.* at 20-21. Although Father testified that he had a prescription for opiates to explain his positive drug screens, *see id.* at 32, the trial court was entitled to reject Father's generalized and unsubstantiated assertions. *See S.P.*, 47 A.3d at 826-27. Father did not progress beyond a weekly supervised visit with Children, and with the exception of one medical appointment, he did not consistently attend Children's medical appointments. *Id.* at 26, 30. Moreover, as emphasized by the trial court, Father's repeated incarcerations also evidenced his inability to provide meaningful, stable parental care to Children. Indeed, following his most recent incarceration for the Blair County charges, Father had only minimal contact with Children, sending pictures to Children once and participating in one individualized education program (IEP) matter. *Id.* at 25, 35. Accordingly, the record contains no indication that Father made diligent efforts toward a reasonably prompt assumption of full parental responsibilities. *See A.L.D.*, 797 A.2d at 340.

In sum, having reviewed the parties' arguments and the record, we find no basis to disturb the trial court's findings of fact, which were supported by

the record.  Moreover, we discern no error in the trial court's legal conclusions that Father's repeated and continued incapacity to parent caused Children to be without essential parental care and that Father could not or would not remedy the incapacity.  *See C.D.R.*, 111 A.3d at 1216; *M.E.P.*, 825 A.2d at 1272.  As this Court has stated, "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa. Super. 2006) (citation and footnote omitted).  Accordingly, we affirm the trial court's ruling to terminate Father's parental rights under Section 2511(a)(2).  *See S.P.*, 47 A.3d at 826-27.

Father's next claim involves two arguments.  First, Father contends that the trial court erred in terminating his parental rights under Section 2511(b).  Father's Brief at 16.  Second, Father argues that Children did not have adequate representation of their legal interests.  *Id.*  We address these arguments separately.

First, as to the existence of a bond with Children, Father notes that he visited regularly with Children following his release from prison for the Philadelphia convictions.  *Id.*  He emphasizes that he was present for Children's oral surgery and that he participated in an IEP.  *Id.*  He adds that he did not have opportunities to visit Children when in prison for the Blair County offenses.  Father asserts there was a parental bond with Children and Children "looked to [Father to fulfill] their emotional, medical, and educational need." *Id.* at 16-17.

DHS responds that the trial court properly terminated Father's parental rights under Section 2511(b) "because the record reflected that Children did not share parent-child bonds with him."[12]  DHS's Brief at 26.  DHS notes that the record supported the trial court's finding that termination best suited Children's needs and welfare.  *Id.*  Specifically, DHS states that Father did not progress past supervised vitiations on a weekly basis, and that Ms. Dixon testified that Father and Children had more a sibling-type bond than a parent-child bond.  *Id.*  According to DHS, Ms. Dixon testified that when Father began regular visits with Children after his release from prison on the Philadelphia convictions, Children had to warm back up to him over time because of the lack of contact with Father, and they did not complain or act out when their visits with Father ended.  *Id.* at 26-27.  Additionally, DHS notes that Ms. Paller opined that there was no bond between Father and K.D.A. and K.K.A, because they told her that they did not "really see him."  *Id.* at 27.

Section 2511(b) states:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

---

[12] The GAL also argued that the trial court properly terminated Father's parental rights under Section 2511(b).

This Court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but the focus of Section 2511(b) is on the child. *See In re C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008). In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (some citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted). Further, "in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citation omitted).

Instantly, the trial court considered Section 2511(b) as follows:

> [L]et me be clear, in addition, [Father's] testimony is that he has a good relationship with [Children] and that he's maintained a place of importance, but the testimony of Ms. [Paller], which I find credible, is that at least [K.D.A.] and [K.K.A.] don't have the same

impression of [Father], and that, in fact, their impression -- even though he was visiting consistently from March until seemingly November -- is, we don't see him very often. That, in and of itself, for a 9-year–old and an 8-year-old, is very telling. And so, with respect to [Section 2511(a)(2)], the testimony of Ms. [Paller] is very critical and seems to indicate that [K.D.A. and K.K.A.] don't have the same -- an attachment to [Father] that would be that of a father/daughter attachment. In fact, as to [K.D.A. and K.K.A.], they specifically told Ms. [Paller] that they would be fine if they never got to see [Father] again.

With respect to [K.A.], she's only four, so there was not the same assessment given to her. But CUA testified that the relationship of [Father] with [Children] is not that of a father/child, that [Children] don't really have a negative reaction when [Father] doesn't make himself available for visits, and that they seem to be fine. So, based on that, this Court is going to find that there is no parent/child bond between [F]ather and [Children] and, as such, there would not be any detrimental impact if his rights were terminated involuntarily as to [Children].

*Id.* at 52-56.

Following our review, we conclude that the record supported the trial court's findings of fact and conclusions of law. We acknowledge, as did the trial court, that Father testified that there was a meaningful parent-child bond with Children. However, there was ample evidence supporting the trial court's determinations that no positive parent-child bond existed and that the termination of Father's parental rights would not harm Children's developmental, physical, and emotional needs and welfare. *See* N.T. at 22-24, 40-42. Therefore, we affirm the trial court's rulings as to Section 2511(b). *See S.P.*, 47 A.3d at 826-27.

Second, as to Children's right to counsel, Father asserts:

[*In re Adoption of L.B.M.*, 161 A.3d 172, 174 (Pa. 2017)], requires that an attorney for the child be appointed to represent

- 19 -

a child's legal interests. This requirement requires an attorney and not a social worker. **If the court had meant that testimony from a social worker would suffice for this requirement of a child advocate attorney, then the GAL could have performed this role and hired a social worker.** A child advocate attorney is required, at the very least, to meet with his or her client. This requirement has not been met in this case.

Father's Brief at 15-16 (emphasis in original). Father further relies on this Court's decision in *In the Interest of D.N.G.*, ___ A.3d ___, 2020 PA Super 62, 2020 WL 1226501 (Pa. Super. filed Mar. 13, 2020), to argue that legal counsel for K.D.A. and K.K.A did not honor Children's right to adequate representation. *Id.* at 16.

DHS asserts that that legal counsel "in the instant matter properly fulfilled her duties." DHS's Brief at 29. According to DHS, "K.D.A.'s and K.K.A.'s positions were clear," and legal counsel advocated consistently with their wishes" and "actively participated" throughout the hearing." *Id.* at 31. DHS asserts that "Father's reliance on *D.N.G.* is misguided" because *D.N.G.* involved a case where the child expressed an interest in reunifying with a parent. *Id.*

Legal counsel has also filed a brief responding to Father's assertion that her representation of K.D.A. and K.K.A. was inadequate. Legal counsel notes that she obtained an expert who determined that K.D.A. and K.K.A's interests were aligned with adoption. Legal Counsel's Brief at 7. Legal counsel asserts that she "discharged her duty to protect [K.D.A. and K.K.A's] legal interest by "not only offering testimony of an expert witness, a forensic social worker, but

also by zealously advocating for [K.D.A. and K.K.A's] interest." *Id.* Legal counsel also states that Father's reliance on *D.N.G.* is "flawed." *Id.*

The GAL has also submitted a brief. In relevant part, the GAL contends that "K.A. was four-years old at the time of the [termination] hearing and at the time that counsel visited her, [K.A.] was unable to verbalize where she wanted to live or understand the meaning of adoption." GAL's Brief at 12. The GAL notes that "K.A. had one attorney representing her desires and interests." *Id.*

Section 2313(a) of the Adoption Act states:

The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S. § 2313(a).

In *L.B.M.*, our Supreme Court considered "whether 23 Pa.C.S. § 2313(a), which mandates the appointment of counsel for children involved in contested involuntary termination of parental rights . . . proceedings, is satisfied by the appointment of a [GAL] provided that the GAL is an attorney." *L.B.M.*, 161 A.3d at 174. In *L.B.M.*,

a majority of the Court agreed on several points: (a) in the context of contested termination-of-parental-rights . . . proceedings, the first sentence of Section 2313(a) requires that the common pleas court appoint an attorney to represent the child's legal interests, *i.e.*, the child's

- 21 -

preferred outcome; (b) where there is a conflict between the child's legal interests and his best interests, [a GAL], who advocates for the child's best interests, cannot simultaneously represent the child's legal interests; and (c) in such a circumstance, the failure to appoint a separate attorney to represent the child's legal interests constitutes structural error, meaning it is not subject to a harmless-error analysis.

*In re T.S.*, 192 A.3d 1080, 1082 (Pa. 2018) (footnotes omitted).

In *T.S.*, our Supreme Court held that the trial court did not err in allowing the children's GAL to act as their counsel during the termination proceeding because, at two and three years old, the children were incapable of expressing their preferred outcome. *Id.* at 1089, 1092. The Court explained that Section 2313(a) was satisfied by the representation of the children by the GAL because "if the preferred outcome of [the children is] incapable of ascertainment because [they are] very young and pre-verbal, [then] there can be no conflict between the [children's] legal interests and his or her best interests." *Id.* at 1092-93. The Court further reaffirmed that "where there is no conflict between a child's legal and best interests, [a GAL] representing the child's best interests can also represent the child's legal interests." *Id.* at 1092.

In *In re Adoption of K.M.G.*, 219 A.3d 662 (Pa. Super. 2019) (*en banc*), *appeal granted in part*, 221 A.3d 649 (Pa. 2019), this Court considered "the procedural issue of whether Superior Court must *sua sponte* review every termination case to make an independent determination of whether a GAL has a conflict." *K.M.G.*, 219 A.3d at 667. The *K.M.G.* Court held that the Superior

Court "only has the authority to raise *sua sponte* the issue of whether the lower court appointed any counsel for the child, and not the authority to delve into the quality of the representation." ***Id.*** at 667-68.

In so holding, the ***K.M.G.*** Court overruled ***In re Adoption of T.M.L.M.***, 184 A.3d 585, 587 (Pa. Super. 2018), and reasoned as follows:

> A three-judge panel of this Court, in ***T.M.L.M.***, held that Superior Court must *sua sponte* make an independent determination of whether a GAL has a conflict in every involuntary termination case. In that case, the orphans' court stated on the record that the appointment of the GAL for the involuntary termination hearing complied with ***L.B.M.*** and, thus, Section 2313(a). No party on appeal contested this finding of the orphans' court. Yet, the panel in ***T.M.L.M.*** *sua sponte* reviewed the record, found that the GAL may have a conflict, reversed the order terminating the mother's parental rights, and remanded the case for further proceedings.
>
> \* \* \*
>
> It is well established that an appellate court may not raise an issue *sua sponte*, except when the issue addresses the subject-matter jurisdiction of the court.
>
> There are, however, a few discrete, limited non-jurisdictional issues that the Supreme Court has authorized the lower courts to raise *sua sponte*, such as waiver as a result of various briefing defects.
>
> \* \* \*
>
> Similarly, when the orphans' court fails to appoint any counsel for a child in an involuntary termination hearing, Superior Court may raise this issue *sua sponte*.
>
> \* \* \*
>
> The Supreme Court disfavors the intermediate appellate court's consideration of issues *sua sponte* because it is more important to respect orderly judicial decision-making, afford counsel the

- 23 -

opportunity to brief and argue issues, permit the court to benefit from counsel's advocacy, and uphold issue preservation rules.

Although our Supreme Court has authorized the appellate courts to raise *sua sponte* the issues above, it has not authorized the Superior Court to raise *sua sponte* the issue of whether a GAL representing a child in an involuntary termination hearing has a conflict in such representation. In fact, the most recent Pennsylvania Supreme Court cases addressing the child's statutory right to legal counsel, as opposed to a GAL, in an involuntary termination hearing pursuant to 23 Pa.C.S. § 2313(a) do not involve situations in which the Superior Court raised the issue *sua sponte*.

In **L.B.M.**, the parents raised the issue of a conflict with the orphans' court and appealed the issue to Superior Court. Similarly, in **T.S.**, the parents raised the issue of a conflict in Superior Court. In both cases, because the parents raised the conflict issue before either the orphans' court or Superior Court, there was no reason for the Supreme Court to address whether Superior Court can raise the conflict issue *sua sponte*. Thus, at this point, the Supreme Court has not authorized Superior Court to raise the conflict issue *sua sponte*.

\* \* \*

Applying the current precedent to these facts, Superior Court has no authority to raise *sua sponte* the issue of whether a GAL has a conflict. Rather, as stated previously, this Court only has the authority to raise *sua sponte* the trial court's failure to appoint any counsel for the Child. In this case, the orphans' court did appoint counsel, the GAL, and we have no authority to delve into the quality of the GAL's representation. The Supreme Court has not authorized us to do so.

**K.M.G.**, 219 A.3d at 668-69 (citations omitted).

In light of the foregoing, we are constrained to conclude that in the present case, this Court cannot consider whether there was a conflict of interest in the GAL's representation of K.A. There is no indication that Father objected to the trial court's decision not to appoint separate legal counsel for

K.A.  *See* N.T. at 59.  Furthermore, similar to **K.M.G.**, Father has not developed any argument that the GAL had a conflict when representing K.A. *See* Father's Brief at 15-16.  Therefore, **K.M.G.** precludes this Court from addressing the GAL's representation of K.A. on our own accord where Father has not done so himself.[13]  *See **K.M.G.***, 219 A.3d at 668-69.

With respect to Father's remaining claims as to legal counsel's representation of K.K.A. and K.D.A., Father has argued in his brief that legal counsel's representation violated Section 2313(a) in light of **L.B.M.**  Therefore, we will address Father's arguments that legal counsel's representation was inadequate, even though Father did not preserve this issue in the trial court. ***See T.S.***, 192 A.3d at 1092; ***D.N.G.***, 2020 WL 1226501 at *4.

In **D.N.G.**, the trial court appointed legal counsel for a child in a contested involuntary termination of parental rights proceeding, while the GAL continued to represent the child's best interests.  **D.N.G.**, 2020 WL 1226501 at *2.  At the termination hearing, legal counsel in that case informed the trial court that the child opposed adoption and wanted to return to his mother.  ***Id.***

---

[13] We note that our Supreme Court granted allowance of appeal, in part, in **K.M.G.** to consider whether this Court erred in concluding it had no authority to review whether a child's legal interest was represented as required by Section 2313 and **L.B.M.  See K.M.G.**, 221 A.3d at 649.  However, this Court's *en banc* decision in **K.M.G.** remains binding until it is overruled.  ***See Marks v. Nationwide Ins. Co.***, 762 A.2d 1098, 1101 (Pa. Super. 2000) ("we have long held that as long as the decision has not been overturned by our Supreme Court, a decision by our Court remains binding precedent").

However, legal counsel did not present any evidence or examine witnesses to support the child's stated preferences.[14] *Id.* On appeal from the order terminating her parental rights to the child, the mother, for the first time on appeal, asserted that legal counsel "neglected to represent" the child's stated preferences against adoption and for a return to his mother. *Id.*

The *D.N.G.* Court agreed with the mother, noting:

[B]ased upon our review of the record, we conclude that [legal counsel's] representation did not satisfy the mandate of § 2313(a), because he neglected to advocate for his client's legal interest. Under the circumstances of this case, where the [GAL] argued against termination and recommended a thorough bond analysis, and where an eleven-year-old stated unequivocally that he desired to return to his mother, it is not possible for legal counsel to zealously represent his client's legal interest merely by engaging in one discussion with the child on the eve of trial and then summarizing that conversation for the family court. Rather than simply reporting a preference to the family court, it was [legal counsel's] obligation to engage in client-directed advocacy on behalf of [the child] with regard to the child's preferred outcome. Therefore, we hold that [the child] was deprived of his statutory right to counsel to advance his legal interest, a deprivation that continues in this appeal.

*Id.* at *5.

Instantly, legal counsel for K.D.A. and K.K.A. took steps to ascertain and present evidence regarding K.D.A. and K.K.A.'s legal interests in adoption by retaining an expert. *See* N.T. at 4. Although legal counsel did not expressly

_____

[14] Additionally, in *D.N.G.*, Mother requested that the child be placed in permanent legal custody instead of adoption, and the GAL advocated against termination and requested a comprehensive bonding assessment. *D.N.G.*, 2020 WL 1226501 at *2.

state that she personally met with K.D.A. and K.K.A., legal counsel explained she retained an expert to confirm K.D.A. and K.K.A.'s preferences for adoption and against reunification and to present evidence of K.D.A. and K.K.A.'s preferences without requiring legal counsel to testify.[15] ***See id.*** Because K.D.A. and K.K.A. expressed their desires to be adopted and not to reunify with their parent, any failure to advocate in favor of reunification was not the kind of structural error described in ***L.B.M.*** and ***T.S.*** ***See T.S.***, 192 A.3d at 1092. Similarly, because legal counsel advocated in favor of K.D.A. and K.K.A's stated interests in adoption at the termination hearing, Father's reliance on ***D.N.G***. to argue that legal counsel's representation was deficient merits no relief. ***See D.N.G.***, 2020 WL 1226501 at *5.

Order affirmed.

---

[15] We note that this Court has held that the rules against hearsay did not preclude legal counsel from informing the court of a child's position regarding the termination of parental rights. ***In re B.J.Z.***, 207 A.3d 914, 920 (Pa. Super. 2019). We add, however, that at least one Pennsylvania Supreme Court Justice, in a different case, has expressed a willingness to review a similar question in a dissent to an order denying allowance of appeal. ***See Interest of J.C.F.***, 199 A.3d 859 (Pa. 2018) (*per curiam* order) (Wecht, J. dissenting).

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 7/22/2020*